UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 8:19-cr-132-T-24AAS

LELIA VANESSA PERDOMO ZAPATA

## UNITED STATES' SENTENCING MEMO

The United States of America, by and through the undersigned Assistant United States Attorney, submits this memorandum in response to defendant Lelia Vanessa Perdomo Zapata's contentions, which she makes through objections to the U.S. Sentencing Guidelines calculation in her Presentence Investigation Report ("PSR"), that she: 1) does not warrant a two-level enhancement for obstruction of justice pursuant to USSG §3C1.1; 2) that she warrants a Safety Valve reduction pursuant to USSG § 5C1.2(a)(5) and 18 U.S.C. § 3533(f)(5), and 3) a minor role reduction pursuant to USSG § 3B1.2.

## BACKGROUND

On March 28, 2019, the Defendant was charged in a two-count indictment with possession, and conspiracy to possess, with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. § 70501, *et seq.*

The charges stemmed from a U.S. Coast Guard interdiction that occurred on March 13, 2019, and continued to the early morning of March 14, 2019. The Coast Guard interdicted a sailing vessel named "El Senor De Los Vientos" in international waters, approximately 54 nautical miles northwest of Providencia, Colombia.

Members of the Coast Guard conducted right of approach questions and the master of the vessel - which was flying a Panamanian flag - made a verbal claim of Panamanian nationality for the vessel. On March 14, 2019, the Government of Panama confirmed the vessel's registry and granted authorization to board and search the vessel. During a search of the vessel, the Coast Guard found the defendant, Lelia Vanessa Perdomo Zapata, and Luis Ballart ("Lucho") on board. They also recovered 18 bales containing approximately 441 kilograms of cocaine.

Zapata exercised her constitutional right to a jury trial. The trial commenced on August 26, 2019, and lasted five days. On August 30, 2019, the jury convicted Zapata of both counts. Only after being convicted at trial, did Zapata agree to speak to agents. During the interview, Zapata admitted much of her testimony during trial was false. Zapata did not however, provide a complete and entirely truthful account of her participation on this drug smuggling conspiracy.

## MEMORANDUM OF LAW

### I.     OBSTRUCTION OF JUSTICE – A LIE IS A LIE IS A LIE

United States Sentencing Guideline §3C1.1 states that:

"if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or a closely related offense, increase the offense level by 2 levels."

USSG §3C1.1cmt. N.2 states that the provision "is not intended to punish a defendant for the exercise of a constitutional right…a defendant's denial of guilty (**other than a denial of guilt under oath that constitutes perjury**) … is not a basis for application of this provision. Such conduct "is not subject to precise definition [but] comparison of the examples set forth in Application Notes 4 and 5 should assist the court in determining whether this adjustment is warranted." *Id.*

United States Sentencing Guidelines §3C1.1cmt. N.4 provides a non-exhaustive list of the types of conduct to which the obstruction enhancement would apply. Specifically, N.4(b), states: "committing, suborning, or attempting to suborn perjury, including during the course of a civil proceedings if such perjury pertaining to conduct that forms the basis of the offense of conviction." *Id.* The Supreme Court has defined perjury in this context as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v.*

*Dunnigan,* 507 U.S. 87, 94–95, 113 S. Ct. 1111, 122 L.Ed.2d 445 (1993). For §

3C1.1 purposes, "material matters" are those that "if believed, would tend to

influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n. 6.

*See United States v. Wallace,* 425 F. App'x 841, 842 (11th Cir. 2011). "Under

U.S.S.G. § 3C1.1, the threshold for materiality is 'conspicuously low.'" *United*

*States v. Dedeker,* 961 F.2d 164, 167 (11th Cir.1992).

In *Dunnigan,* the Supreme Court explained that not "every accused who

testifies at trial and is convicted will incur an enhanced sentenced under

§ 3C1.1." *Id.* When a defendant objects to an obstruction enhancement resulting

from his trial testimony, "a district court must review the evidence and make

independent findings necessary to establish a willful impediment to or obstruction

of justice, or an attempt to do the same." *Id.* The Court also stated that a district

court's determination that the obstruction enhancement applies is sufficient as

long as "the court makes a finding of an obstruction of, or impediment to, justice

that encompasses all of the factual predicates for a finding of perjury." *Id. See*

*United States v. Stahlman*, 934 F.3d 1199, 1228 (11th Cir. 2019), *cert. denied*, No.

19-6315, 2019 WL 6107893 (U.S. Nov. 18, 2019) (affirmed district court's

obstruction enhancement because defendant did not tell the truth regarding his

sexually thoughts towards children, and finding that his testimony was not

credible[1]); *United States v. Vera*, 639 F. 581 (11th Cir. 2016) (defendant denied

"absolutely" that he was involved in marijuana cultivation, when the testimony

of witnesses contradicted flatly and was irreconcilable with his testimony and

further supported by the jury's guilty verdict.)

     In this case, the defendant testified during her trial for almost a full day.

Many of her statements, such as not having any knowledge that there was

cocaine on board the vessel, having no association with Alvaro or the conspiracy,

or never intending to distribute cocaine, are irreconcilable with the jury's guilty

verdicts, and the elements of the offenses the United States was required to prove.

Other statements the defendant made, such as not using the spot tracker, satellite

phone or BLU cellphone, are contrary to the evidence presented at trial. More

brazen of all, some statements Zapata made under oath during trial, she would

admit were complete fabrications.

     Near the start of her testimony, the defendant began to discuss her diary,

which had been found on board the "Senor De Los Vientos," and which the

government had previously sought to exclude from trial. The Court ultimately

admitted the diary, alongside its English translation. Zapata then began to read a

note from her diary that was dated March 12, 2019, presumably five days before

---

[1] The Court noted that it may have been "preferable" for the district court to provide a more detailed discussion of its reasons for applying the obstruction enhancement at sentencing.

the U.S. Coast Guard boarded the vessel and discovered the bales of cocaine. (Exhibit A, Zapata Transcripts, page 84, line 21.) The March 12, 2019 note discussed, among other things, how much Zapata missed her boyfriend, how much she loved him, how much money her co-defendant "Lucho" had paid her, how beautiful the sky was, her reason for going on this trip, her destination, and how beautiful it would be to have a child that she could dedicate her life to. (page 84, line 2). As Zapata read the passage to the jury, tears began streaming down her cheeks. She continued to read, stopping only occasionally to stare at the jury, which appeared captivated. Tears continued to flow from her eyes, and were in her voice when she spoke. It was a performance worthy of an Oscar. And as it turned out, completely fabricated. During a post-trial interview with federal agents Zapata would confirm exactly what the government had long believed— that she had written that note for the very purpose of attempting to masquerade her role in the conspiracy - to use as a cover story if the sailing vessel was interdicted, in order to obstruct and impede her prosecution.

The diary is only one of many examples where Zapata's testimony, both in direct and cross examination, and while under oath, differed from the truth. The severity of her lies were only expounded by the brashness in which she told them. Throughout her testimony, Zapata cried, laughed, at times she expressed indignation, and displayed complete outrage at being prosecuted. Depicted below

is a non-exhaustive recitation of statements Zapata made that are demonstrably false, and a clear effort to obstruct and impede her prosecution.

### A.   Cocaine

Throughout her testimony, Zapata maintained that she had no idea there was cocaine in the vessel when she boarded, (page 50, lines 14-16); that she only noticed there was cocaine on the boat <u>after</u> they departed, when she saw the bales in the room didn't "let [her] go [inside] the room." (page 51, lines 7-20). She stated she did not bring cocaine on the boat, did not see anyone bring cocaine on the boat, and did not observe three men load the boat with cocaine (page 62, lines 10-18). Zapata added that she was not in any way hired to "observe" cocaine on the boat (page 69, line 23) and that she was only on the vessel because "Lucho had invited me to Cancun…to sell his boat." (page 54, line 25, and page 26, line 1-4). Zapata further denied being a load guard for Alvaro; and stated she was "introduced to Alvaro, by Lucho;" and only knew Alvaro because she had a "three way with [Alvaro] and one of the girls who was there." (page 27 line 20 and page 30 line 16).

After trial, Zapata would admit to federal agents during a post-trial interview that she did in fact lie, and knew several days before she left Colombia that the trip was a drug smuggling venture. Zapata stated that - exactly as Ballart

had testified - the vessel was loaded with cocaine at sea when three men arrived in a go-fast vessel that had a gray hull.

### B.   BLU Phone

At trial, the United States introduced numerous phone calls, and WhatsApp voice and text messages that were sent from a BLU cellphone. That evidence connected Zapata to Alvaro, who had been identified as the organizer and recruiter for the drug venture. During trial, Zapata made numerous false statements under oath regarding the BLU phone. Specifically, Zapata:

- denied receiving the BLU phone from Alvaro, and stated she received it from Lucho because she had lost her phone and had asked Lucho to buy her a new one so she could call her family (page 24, line 8);

- did not know who was contact "DIU" on the BLU phone but that it was not her contact (page 27, line 10);

- did not save Alvaro's number on the BLU phone as a contact and had no idea who did (page 31, lines 5-15);

- did not make any calls to Alvaro on the BLU phone and that it was "Lucho's workers" who called him (page 25, line 22);

- claimed that "[Alvaro] wasn't her contact" (page 143, lines 8-9);

- asserted that she did not have the BLU phone when she went on the boat, because "one of Lucho's workers had it" (page 43, lines 2-10);

- did not call Alvaro on March 8, 2019, between 2:00 - 3:00 p.m., and that it was "Lucho's workers" (page 47, lines 8-11);

- when showed WhatsApp chat communications with Alvaro and asked "are you chatting with Alvaro here" Zapata responded "no, that's not me" (page 72,  lines 21-23);

- stated she "never" had a WhatsApp communications with Alvaro (page 73, lines 5-6);

- denied making a call to Alvaro on the BLU phone on March 8, 2019, at 4:14 p.m., "no I did not pick up that call. It was not I" (page 136, lines 20-23 and page 137, lines 10-11);

- denied having the BLU phone two hours later at around 6:00 p.m. (page 137, lines 17-19);

- when asked "so it is your testimony that you did not make or receive any of these calls from Alvaro at 6:30 on March 8, 2019," Zapata responded "exactly" (page 137, lines 20-22);

- when asked "isn't it also true that you made and received these calls just a few minutes later with Alvaro," she responded "it not I who received those phone calls, no" (page 137, line 25);

- when asked "yes or no, you called Alvaro from that BLU phone on March 13th, at 8:36 p.m.," Zapata responded "no. it's not I" (page 139, lines 18-33); and

- when asked "and that's because – you were trying to call Alvaro at that exact moment after you called your mother?" Zapata responded "No. Why [would] I be calling him? What would I need him for?" (page 141, lines 21-25).

Unsurprisingly, everything Zapata denied at trial and swore was "not true," she later admitted was true. During her post trial interview, Zapata admitted to lying when she testified regarding her involvement with Alvaro, as well as the phone calls and text messages found on the BLU cellphone. Specifically, she admitted that all the calls made and received on the BLU cellphone with Alvaro, were made or received by her and not Lucho. Zapata

specified that she communicated with Alvaro before the trip, the day after the drugs were loaded onto the vessel and continued to update him on the status of the venture after departing Colombia. Zapata also stated that she knew that the contact saved on the BLU phone as "DIU" was another number for Alvaro.

## C.    Satellite phone

At trial, the United States introduced evidence that phone number 00573108059833, which was sent from Alvaro to the BLU cellphone, was later saved as contact "AA" in the satellite phone. Evidence was later introduced that the satellite phone was used by Zapata, and that she made several phone calls to "AA" (Alvaro) from the satellite phone. During her testimony, Zapata made numerous false statements regarding her involvement and use of the satellite phone. Specifically:

- upon being shown the satellite phone, (Government Trial Exhibit 3), Zapata, stated she had never seen the satellite phone, and that it "looked like one of those artifacts, like one of those old ones" (page 34, lines 17-18);

- stated she had "never used it…didn't even know how" (page 34, line 21);

- when asked whether she brought the satellite phone on the boat, she responded, "no…that is not right. I didn't take it to the boat" (page 108, lines 1-4);

- when asked "you don't know how to use that? You've never handled a phone of that nature?" Zapata responded "No, ma'am. I have – I don't know what the telephone is like. I don't know what it is for. I don't know how to use it. I don't know. I don't know" (page 34, lines 21-25 and page 35, line1);

- when asked if she had seen Lucho use the satellite phone, she responded "He used it during the trip. He would go outside to use it. He said that he would have to use it outside because the signal was low or something. I don't know…But on one occasion I asked him if I we can call my mom. And he said yes, and then he said no." (page 36, lines 3-9). Zapata added "I did not know how to do it. He didn't tell me how to use it" (page 36, lines 15-17);

- asserted that she did not try to send or receive any messages from the satellite phone" (page 71, lines 3-9);

- when asked whether she "saved the number that Alvaro sent [her] in the [BLU phone to the] satellite phone," she responded "no, that's not true" (page 148, lines 20-22);

- did not know who was contact "AA" that was saved on the satellite phone (page 71, lines 11-14);

- when asked "in fact, you saved it under AA for Alvaro," she again stated "No. I was not the one who saved it" (page 148, line 24), and

- when asked "but at least you'll admit here, under oath, that you did use this phone right?" she responded "I didn't use it" (page 108, lines 5-7);
- when asked "Alvaro told you that the number you're missing is 00573108059833," she responded "he didn't say that to me…it must have been to Lucho's workers…" (page 147, lines 6, and 18-19), and

- when asked "you tried to call Alvaro on the satellite phone," she again responded, "No. it's not true. I don't know why you're trying to accuse me, saying that that's the truth. It's not true" (page 149, lines 14-19).

Zapata would later admit to agents that she knew about the satellite phone,

had been shown how to operate it, and had been told by Alvaro to "keep tabs on

Lucho and report how the trip was going." Zapata also stated she called and

spoken to Alvaro on the satellite phone after the cocaine was loaded into the vessel, and again approximately three days after they departed.

### D.   Spot Tracker

During her testimony, Zapata made various statements regarding the spot tracker that was found on board the vessel. Specifically, Zapata stated she had "never flown with this device" (page 19, line 25), was "never" in possession of this device (page 20, line 1), never "travelled with this device" (71, lines 22-25), never brought the device to Cartagena (page 150, line 12) or take the "the device on the sailboat," (page 149, lines 20-25 and page 150, lines 1-3). Those statements are demonstrably false, and a clear effort to obstruct and impede her prosecution.

At trial, the United States introduced uncontroverted evidence that the GPS data from the spot tracker showed that the vessel continued to travel between Cali, Colombia - a city that minutes away from Palmira, where Zapata was from - to Cartagena, Colombia, several hundred miles apart. This was important for two reason: First, the spot tracker data showed that for the exception of one specific day - February 22, 2019 - the spot tracker remained on land for all of 2018 and 2019, until Zapata and Ballart departed on March 2019. Because it was undisputed Ballart lived on his boat, in the water, he could not have actively been using the spot tracker while the spot tracker was on land and

traveling to and from Cali. [2] Forensic extractions introduced at trial of the BLU

phone captured images sent to members of Zapata's family. Those images

depicted Zapata, and Ballart, along with children from the local town going on a

trip on the vessel. Those images were sent from the BLU phone on February 23,

2019, at 11:48 a.m. Ballart testified that the trip occurred in the afternoon and

therefore because those images were sent at 11:48 a.m., he believed the trip

occurred the day before the images were sent, on February 22, 2019. To put it

simply, the only day the spot tracker was actively on the water prior to their

departure, was the only day we know conclusively Zapata was also at sea. [3]

Second, the GPS data from the spot tracker showed that it continued to

travel between Cali, Cartagena, and various other cities in Colombia. Ballart

testified that he had never been to Cali, or any of the other cities, as they were not

along the coast. Of note is that the spot tracker would travel between airports in

Cali, and Cartagena, and never sail on the coast. Specifically, the spot tracker was

in Cali on January 22, 2019. Three days earlier, out of all the cities in Colombia,

Zapata was also in Cali, applying and receiving her Colombian passport. (page

151, lines 16-17). As such, the evidence is clear that Zapata fabricated a false

---

[2] Ballart would have had to cross the Panama Canal to sail from Cartagena, to reach the Southern West Coast of Colombia, near Cali.
[3] Zapata admitted to being on board the vessel with Ballart on Febuary 23, 2019. (Page 126 line 4-20).

narrative about the spot tracker, exactly as she had for the BLU phone and the satellite phone.

At trial, the United States introduced evidence that the bales of cocaine in the vessel had been covered by blankets and life jackets in an attempt to hide them from the Coast Guard. Ballart testified that when Zapata saw the Coast Guard, she immediately began to hide the bales of cocaine with blankets and life jackets. During her testimony, Zapata denied hiding "anything in any way" after seeing the Coast Guard approach their vessel. (page 58, lines 13-15). Zapata would later admit to agents that she did in fact hide the bales of cocaine with blankets and other items after seeing the Coast Guard.

Whether it was her involvement with Alvaro, her use of the BLU cellphone, her diary, her knowledge of the cocaine on board, her use of the satellite phone, her efforts to hide the cocaine, or her entire role in the conspiracy, it is hard to think of a single topic that Zapata did not lie about.

Because those lies are clearly related to the offense of conviction, she warrants a two-level offense increase pursuant to USSG §3C1.1.

## II.   SAFETY VALVE

The United States contends that the defendant does not qualify for a two-level downward adjustment and application of the "safety valve" for purposes of disregarding the statutory mandatory minimum penalty pursuant to USSG

§ 5C1.2(a)(5) and 18 U.S.C. § 3533(f)(5). That is, Zapata has not completely and

truthfully provided all information she has concerning the subject offenses. *See*

*United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997) ("The burden is on the

defendant to come forward and to supply truthfully to the government all the

information that he possesses about his involvement in the offense, including

information relating to the involvement of others.").

The fifth safety valve criteria is a "'tell-all' provision. To meet its

requirements, the defendant has an affirmative responsibility 'to truthfully

disclose to the government all information and evidence that he has about the

offense and all relevant conduct.'" *United States v. Johnson*, 375 F.3d 1300, 1302;

*see also United States v. Salter*, 745 F. App'x 149, 150 (11th Cir. 2018); *United States

v. Figueroa*, 199 F.3d 1281, 1282–83 (11th Cir. 2000) (a defendant who "withheld

or misrepresented information" is not eligible for safety valve relief). In meeting

this burden, the defendant must actually present evidence and may not simply

rely on "claims [of] ignorance as a justification for nondisclosure." *United States v.

Talavera*, 697 F. App'x 671, 672 (11th Cir. 2017).

Furthermore, "the United States has no burden to refute a defendant's

assertion that his information is truthful if his proffer is inadequate." *United States

v. Sanchez*, 475 F.3d 978, 980 (8th Cir. 2007). *See also*, *United States v. Goveo-

Zaragoza*, 311 F. App'x 235, 238 (11th Cir. 2009) (upholding denial of safety valve

where government did not offer any evidence to demonstrate that his statements and testimony were not truthful and complete); *United States v. Marquez*, 280 F.3d 19, 24 (1st Cir. 2002) ("were we to yield to the appellant's importunings and insist upon extrinsic evidence, district courts would be bound to accept even the most arrant nonsense from a defendant's mouth so long as the government could not directly contradict it by independent proof."); *United States v. Marquez*, 280 F.3d 19, 24 (1st Cir. 2002) ("a sentencing court may reject a safety valve proffer based on its reasoned assessment of the defendant's credibility in light of the facts - and that the court may do so without the benefit of independent rebuttal evidence."); *United States v. Arias*, 782 Fed. Appx. 984, 985 (11th Cir. 2019) (court denied safety valve because it found that it was hard to believe defendant did not know the names of the individuals who hired him.")

In this case, Zapata's only interview with federal agents was riddled with inconsistencies and self-serving lies. For example, Zapata continues to claim that she had no knowledge and never used, the spot tracker found on board the vessel. Zapata states that she was never paid to take part of the drug smuggling venture, but yet, that an unidentified individual, inexplicably paid her to get a Colombian passport. Zapata also claims that the reason she went on the smuggling venture was because "someone kidnapped her brother, and stabbed him 19 times." More cringe worthy of all, during the interview Zapata denied knowing who "DIU"

was, and minutes later, admitted to knowing "DIU" was in fact another number for Alvaro. Because Zapata has not truthfully disclose to the government all information and evidence that she has about the offense and all relevant conduct, she is not entitled to relief under 18 U.S.C. § 3533(f)(5).

### III.   "MINOR ROLE" ADJUSTMENT

In addition to the issues discussed above, Zapata objects to the PSR's lack of a minor role adjustment. The United States opposes the defendants' request for a minor role adjustment and contends that she has not met her burden to demonstrate her entitlement to such an adjustment.

Under the U.S. Sentencing Guidelines, a defendant may receive a two-level reduction if he was a minor participant in the offense of conviction. U.S.S.G. § 3B1.2. The "minor role" adjustment, as it is often called, applies to defendants that are "<u>substantially</u> less culpable than the <u>average</u> participant in the criminal activity." *Id.* § 3B1.2 cmt. n.3(A) (emphasis added). As the proponent of a downward adjustment, the defendant "bears the burden of proving a mitigating role in the offense by a preponderance of the evidence. *United States v. Rodriguez De Varon*, 175 F.3d 930, 939 (11th Cir. 1999).

In determining whether he has met his burden as to a "minor role" adjustment, the Court must first measure the defendant's role against the relevant conduct for which he is being held accountable at sentencing. *Id.* at 940. "In other

words, the district court must assess whether the defendant is a minor…participant in relation to the relevant conduct attributed to the defendant in calculating her base offense level. *Id*. at 941. "[W]here the relevant conduct attributed to a defendant is identical to her actual conduct, she cannot prove that she is entitled to a minor role adjustment simply by pointing to some broader criminal scheme in which she was a minor participant but for which she was not held accountable. *Id*. Consequently, the Court should grant a downward adjustment for "minor role" in the offense "[o]nly if the defendant can establish that she played a relatively minor role in the conduct for which she has already been held accountable-not a minor role in any larger criminal conspiracy." *Id*. at 944.

After conducting the above analysis, the Court should also measure the defendant's culpability in comparison to that of other participants in the relevant conduct. *Id*. However, the Court should look to other participants "only to the extent that they are identifiable or discernable from the evidence." *Id*. Moreover, the Court may consider "only those participants who were involved in the relevant conduct attributed to the defendant." *Id*. "The conduct of participants in any larger criminal conspiracy is irrelevant." *Id*. Finally, a defendant is not entitled to a "minor role" adjustment unless and until the Court determines, based on the evidence presented, that "the defendant was less culpable than *most*

*other participants* in her relevant conduct." *Id*. This means that a defendant is not entitled to a "minor role" adjustment merely because he is "somewhat less culpable than the other discernable participants." *Id*.

In *United States v. Palma-Meza*, 685 F. App'x 806, 807 (11th Cir. 2017), the defendant cited the factors in § 3B1.2 and claimed that he qualified for a minor-role reduction because: "(1) as a mariner, he had little or no understanding of the scope and structure of the overarching criminal activity; (2) he had not planned or organized the smuggling activity; (3) he had no decision-making authority in the venture; (4) he had assisted only with the maritime transportation of the cocaine; and (5) he had no proprietary interest in the cocaine and stood to make a small fraction (between $3,000 and $15,000) of the street value of the cocaine (approximately $17 million)." In rejecting the defendant's argument, the Eleventh Circuit upheld the district court's denial of a mitigating role adjustment and held that the court "permissibly considered the quantity of drugs involved, the small crew size, and Palma-Meza's intelligence, education, and occupation assets as factors relevant to the 'fact-intensive' inquiry into his role in the offense." *Id*. at 810. The Court further held that the defendant's role was "was largely similar to the other two participants" (his co-defendants). *Id*. at 811. The Court reasoned that, "[a]lthough the master and the load guard had duties in addition to Palma-Meza's," he was "in a position to do most of the duties on board the vessel." *Id*.

19

After all, "all three crewmembers took turns driving the vessel and changing the fuel lines, and all three crewmembers helped jettison the cocaine when authorities approached. *Id*.

Similarly, in *United States v. Herrera-Villarreal*, 665 F. App'x 762 (11th Cir. 2016), the Eleventh Circuit applied *De Varon* and the recent clarifying amendment in § 3B1.2 in upholding the denial of a mitigating role to a mariner convicted of transporting cocaine onboard a go-fast vessel. As the Court noted, "the November 2015 amendment to note 3(c) [of § 3B1.2] did not change the fact [that] the essential inquiry is whether the defendant was less culpable than the average participant." *Id*. at 765. In upholding denial of a minor role, the Court noted that the defendant did not carry his burden of proof "to demonstrate that he was less culpable than the other crewmembers, who were the only other identifiable participants in his relevant conduct. *Id*. at 764-65. The Court also held that the defendant "did not have a minor role compared to his relevant conduct" because his "actual conduct was identical to the relevant conduct attributable to him." *Id*. at 764.

In the instant case, Zapata admitted to law enforcement that she was given a satellite phone, and told by Alvaro that she was to "keep tabs on Lucho" and report on how the trip was going with the satellite phone. This statement alone shows that Zapata was not merely as culpable as Ballart, but was actually above

Ballart in the eyes of the conspiracy. Exactly as Ballart testified at trial, organizers and recruiters had no reason to trust him, but they clearly trusted and depended on her. Because Zapata's actual conduct is identical to her relevant conduct, she has not met her burden to demonstrate that she was substantially less culpable than the average participant. Accordingly, she did not have a minor role with respect to her relevant conduct.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney


By:    /s/ Diego F. Novaes
       Diego F. Novaes
       Assistant United States Attorney
       Florida Bar No. 0107376
       400 North Tampa Street, Suite 3200
       Tampa, Florida 33602
       Telephone:  (813) 274-6000
       Facsimile:   (813) 274-6125
       E-mail:  diego.novaes@usdoj.gov

**U.S. v. Lelia Vanessa Perdomo Zapata       Case No. 8:19-cr-132-T-24AAS**

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Angela Wright, Esquire

By:   */s/ Diego F. Novaes*
Diego F. Novaes
Assistant United States Attorney
Florida Bar No. 0107376
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone:  (813) 274-6000
Facsimile:   (813) 274-6125
E-mail:  diego.novaes@usdoj.gov